**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-----------------------------x
                             :
LEATOYA RICHARDSON           :     Civil No. 3:15CV01452 (HBF)
                             :
v.                           :
                             :
NANCY A. BERRYHILL, ACTING   :
COMMISSIONER, SOCIAL SECURITY :
ADMINISTRATION               :
                             :
-----------------------------x
```

<u>**RULING ON CROSS MOTIONS**</u>

Plaintiff Leatoya Richardson brings this action pursuant to 42 U.S.C. §405(g), seeking review of a final decision of the Commissioner of Social Security which denied her application for Supplemental Security Income ("SSI) under Title XVI of the Social Security Act, 42 U.S.C. §401 <u>et seq</u>. ("the Act"). Plaintiff has moved to reverse or remand the case for a rehearing. The Commissioner has moved to affirm.

For the reasons set forth below, plaintiff's Motion to Reverse and/or Remand Decision of Commissioner of Social Security Administration **[Doc. #18]** is **GRANTED** in part and **DENIED** in part. Defendant's Motion for an Order Affirming the Decision of the Commissioner **[Doc. #20]** is **DENIED**.

**I. ADMINISTRATIVE PROCEEDINGS**

The procedural history of this case is not disputed. Plaintiff filed an application for SSI on June 29, 2012,

alleging disability as of June 29, 2012. [Certified Transcript of the Record, Compiled on November 16, 2015, Doc. #13 (hereinafter "Tr.") 19]. Plaintiff alleged disability due to: schizoaffective disorder, obsessive compulsive disorder, migraine headaches, obesity, paranoia, anxiety, depression, bipolar disorder, mood disorder, post-traumatic stress disorder ("PTSD"), and degenerative disc disorder. [Tr. 21, 105, 110, 182]. Her SSI claim was denied initially on November 8, 2012, and upon reconsideration on January 24, 2013. [Tr. 81-95, 97-110]. Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ") on February 27, 2013. [Tr. 19].

On February 21, 2014, Administrative Law Judge ("ALJ") Robert A. DiBiccaro held a hearing, at which plaintiff appeared with an attorney and testified. [Tr. 47-80]. On April 25, 2014, the ALJ found that plaintiff was not disabled, and denied her claim. [Tr. 19-30]. Plaintiff filed a timely request for review of the hearing decision on June 16, 2014. [Tr. 14]. On August 27, 2015, the Appeals Council denied review, thereby rendering ALJ DiBiccaro's decision the final decision of the Commissioner. [Tr. 1-4]. The case is now ripe for review under 42 U.S.C. §405(g).

Plaintiff, represented by counsel, timely filed this action for review and moves to reverse and/or remand the Commissioner's decision.

## II.  STANDARD OF REVIEW

The review of a social security disability determination involves two levels of inquiry. <u>First</u>, the Court must decide whether the Commissioner applied the correct legal principles in making the determination. <u>Second</u>, the Court must decide whether the determination is supported by substantial evidence. <u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). The reviewing court's responsibility is to ensure that a claim has been fairly evaluated by the ALJ. <u>Grey v. Heckler</u>, 721 F.2d 41, 46 (2d Cir. 1983) (citation omitted).

The Court does not reach the second stage of review – evaluating whether substantial evidence supports the ALJ's conclusion – if the Court determines that the ALJ failed to apply the law correctly. <u>See</u> <u>Norman v. Astrue</u>, 912 F. Supp. 2d 33, 70 (S.D.N.Y. 2012) ("The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence."). "Where there is a reasonable basis for doubt

whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

"[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) (alteration added) (citation omitted). The ALJ is free to accept or reject the testimony of any witness, but a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citation omitted). "Moreover, when a finding is potentially dispositive on the issue of disability, there must be enough discussion to enable a reviewing court to determine whether substantial evidence exists to support that finding." Johnston v. Colvin, Civil Action No. 3:13-CV-00073(JCH), 2014 WL 1304715, at *6 (D. Conn. Mar. 31, 2014) (internal citations omitted).

It is important to note that in reviewing the ALJ's decision, this Court's role is not to start from scratch. "In

4

reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (citations and internal quotation marks omitted). "[W]hether there is substantial evidence supporting the appellant's view is not the question here; rather, we must decide whether substantial evidence supports the ALJ's decision." Bonet ex rel. T.B. v. Colvin, 523 F. App'x 58, 59 (2d Cir. 2013)(citations omitted).

## III. SSA LEGAL STANDARD

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.

To be considered disabled under the Act and therefore entitled to benefits, Ms. Richardson must demonstrate that she is unable to work after a date specified "by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Such impairment or impairments must be "of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."

5

42 U.S.C. §423(d)(2)(A); see also 20 C.F.R.

§404.1520(c)(requiring that the impairment "significantly limit

[ ] ... physical or mental ability to do basic work activities"

to be considered "severe").

There is a familiar five-step analysis used to determine if

a person is disabled. See 20 C.F.R. §404.1520(a)(4). In the

Second Circuit, the test is described as follows:

> First, the Secretary considers whether the claimant is
> currently engaged in substantial gainful activity. If he
> is not, the Secretary next considers whether the
> claimant has a "severe impairment" which significantly
> limits his physical or mental ability to do basic work
> activities. If the claimant suffers such an impairment,
> the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed
> in Appendix 1 of the regulations. If the claimant has
> such an impairment, the Secretary will consider him
> disabled without considering vocational factors such as
> age, education, and work experience; the Secretary
> presumes that a claimant who is afflicted with a "listed"
> impairment is unable to perform substantial gainful
> activity.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per

curiam). If and only if the claimant does not have a listed

impairment, the Commissioner engages in the fourth and fifth

steps:

> Assuming the claimant does not have a listed impairment,
> the fourth inquiry is whether, despite the claimant's
> severe impairment, he has the residual functional
> capacity to perform his past work. Finally, if the
> claimant is unable to perform his past work, the
> Secretary then determines whether there is other work
> which the claimant could perform. Under the cases
> previously discussed, the claimant bears the burden of
> proof as to the first four steps, while the Secretary

must prove the final one.

Id.

"Through the fourth step, the claimant carries the burdens of production and persuasion, but if the analysis proceeds to the fifth step, there is a limited shift in the burden of proof and the Commissioner is obligated to demonstrate that jobs exist in the national or local economies that the claimant can perform given his residual functional capacity." Gonzalez ex rel. Guzman v. Dep't of Health and Human Serv., 360 F. App'x 240, 243 (2d Cir. 2010) (citing 68 Fed. Reg. 51155 (Aug. 26, 2003)); Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam)). "Residual functional capacity" is what a person is still capable of doing despite limitations resulting from his physical and mental impairments. See 20 C.F.R. §§404.1545(a), 416.945(a)(1).

"In assessing disability, factors to be considered are (1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Bastien v. Califano, 572 F.2d 908, 912 (2d Cir. 1978) (citation omitted). "[E]ligibility for benefits is to be determined in light of the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied." Id. (citation and internal quotation marks omitted).

## IV.  THE ALJ'S DECISION

Following the above-described five step evaluation process,
ALJ DiBiccaro concluded that plaintiff was not disabled under
the Social Security Act. [Tr. 19-30]. At step one, the ALJ found
that plaintiff had not engaged in substantial gainful activity
since June 29, 2012, the application date.[1]  [Tr. 21].

At step two, the ALJ found that plaintiff had
schizoaffective disorder, obsessive-compulsive disorder,
migraine headaches and obesity that were severe impairments
under the Act and regulations. Id.

At step three, the ALJ found that plaintiff's impairments,
either alone or in combination, did not meet or medically equal
the severity of one of the listed impairments in 20 C.F.R. Pt.
404, Subpart P, Appendix 1. [Tr. 21]. The ALJ specifically
considered Listings 12.03 (schizophrenic, paranoid and other
psychotic disorders), 12.04 (affective disorder) and 12.06
(anxiety disorders). [Tr. 22].  The ALJ also conducted a
psychiatric review technique and found that plaintiff had a mild
restriction in activities of daily living and moderate
difficulties in social functioning, concentration, persistence
or pace. Id. The ALJ found no episodes of decompensation. Id.

---

[1] SSI benefits are not payable for any period prior to the month
after the application is filed. See 42 U.S.C. §1382(c)7); 20
C.F.R. §§416.335, 416.501

Before moving on to step four, the ALJ found plaintiff had the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitation: The claimant is limited to performing simple instructions and routine, repetitive tasks with occasional interaction with supervisors, coworkers and the public." [Tr. 23-29].

At step four, the ALJ found plaintiff has no past relevant work. [Tr. 29]. "The record reflects a limited work history with no evidence of work performed at the substantial gainful activity level." Id. At step five, after considering plaintiff's age, education, work experience and RFC, the ALJ found that jobs existed in significant numbers in the national economy that plaintiff could perform. [Tr. 29-30].

## V.    DISCUSSION

On appeal, plaintiff argues that the ALJ erred in four respects, specifically by:

1. Failing to give controlling weight to the opinion of the treating providers and erring in his assessment of the non-examining psychologists' opinions;

2. Determining her residual functional capacity ("RFC");

3. Failing to call a vocational expert; and

4. Determining plaintiff's credibility.

The Court will address each argument in turn.

A.     Treating Physician Rule

Plaintiff contends that the ALJ failed to give proper
weight to the August 2012 and February 2013 co-signed opinions
of Dr. Kathleen Degen and LCSW Sherilyn Cartagena-Chase[2]. [Doc.
#20-1 at 2-17]. Plaintiff asserts that the ALJ failed to give
"good reasons" for assigning "limited weight" to the opinions
and erred in his interpretation of the medical evidence
including the treatment notes authored by Drs. Degen and Goyal,
and LCSW Cartagena-Chase. [3] [Doc. #20-1 at 2-17; Tr. 844-47
(Mental Impairment Questionnaire dated August 10, 2012); Tr.
1028-31 (Mental Impairment Questionnaire dated February 15,
2013); Tr. 28]. The Court agrees.

A treating source's opinion is given controlling weight if
it is "well-supported by medically acceptable clinical and
laboratory diagnostic techniques and is not inconsistent with
the other substantial evidence in [the] case record." 20 C.F.R.

---

[2] During the course of treating plaintiff, Ms. Cartagena changed
her name to Chase. The Court will refer to her by her hyphenated
name through this opinion.
[3] On February 19, 2014, LCSW Cartagena-Chase completed a Mental
Impairment Questionnaire that was not co-signed by plaintiff's
doctor. [Tr. 1220-25]. The ALJ considered this assessment and
assigned it limited weight, adding, "[a]lthough it mirrors the
two prior assessments that were cosigned by Dr. Degen, this
assessment was not cosigned and is therefore not from an
acceptable medical source." [Tr. 28]. A LCSW does not fall
within the category of "acceptable medical sources." SSR 06-03p,
2006 WL 2329939, at *2. Nevertheless, all relevant evidence in
the case record is required to be considered. Id. at *4; 20
C.F.R. §404.1527(b).

§404.1527(c)(2). If the treating physician's opinion is not supported by objective medical evidence or is inconsistent with other substantial evidence in the record, the ALJ need not give the opinion significant weight. See Poupore v. Astrue, 566 F.3d 303, 307 (2d Cir. 2009) (per curiam). If a treating source's opinion is not given controlling weight, "SSA regulations require the ALJ to consider several factors in determining how much weight the opinion should receive. See 20 C.F.R. §404.1527(c)(2)(i), (2)(ii), (3)-(6)." Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015). "To override the opinion of the treating physician, ... the ALJ must explicitly consider, inter alia: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist." Id. (internal citation omitted). "After considering the above factors, the ALJ must comprehensively set forth his reasons for the weight assigned to a treating physician's opinion." Id. (internal quotation marks and citation omitted). However, a "slavish recitation of each and every factor" is unnecessary "where the ALJ's reasoning and adherence to the regulation are clear." Atwater v. Astrue, 512 F. App'x. 67, 70 (2d Cir. 2013).

Even where a treating physician's opinion is not entitled to "controlling weight," it is generally entitled to "more weight" than the opinions of non-treating and non-examining sources. 20 C.F.R. § 404.1527(c)(2); see Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996) ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."); see also Gonzalez v. Apfel, 113 F. Supp. 2d 580, 589 (S.D.N.Y. 2000). A consultative physician's opinion, by contrast, is generally entitled to "limited weight." Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990) (citations omitted). This is because consultative examinations "'are often brief, are generally performed without benefit or review of the claimant's medical history and, at best, only give a glimpse of the claimant on a single day. Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons.' " Id. (quoting Torres v. Bowen, 700 F. Supp. 1306, 1312 (S.D.N.Y. 1988)).

On August 10, 2012, Dr. Degen and LCSW Cartagena-Chase opined that plaintiff had "no problem" taking care of personal hygiene, asking questions or requesting assistance, carrying out single-step instructions and changing from one simple task to another; a "slight problem" using good judgment regarding safety

and dangerous circumstances, getting along with others without distracting them or exhibiting behavioral extremes; an "obvious problem" caring for physical needs, using appropriate coping skills to meet ordinary demands of a work environment, carrying out multi-step instructions, and performing basic work activities at a reasonable pace/finishing on time; a "serious problem" handing frustration appropriately, interacting appropriately with others in a work environment, respecting/responding appropriately to others in authority, focusing long enough to finish assigned simple activities or tasks; and a "very serious problem" performing work activity on a sustained basis (i.e., 8 hrs. per day, 5 days a week).[4] [Tr. 844-47]. Plaintiff's onset of psychiatric symptoms began in her early 20's and include mood swings, especially depression, paranoia, and anxiety [Tr. 844]. Although fully oriented, she has poor memory, "has trouble" with attention and poor concentration/gets distracted and "not great" judgment. [Tr. 844-45]. Her thought content includes visual hallucinations, paranoid delusions and many OCD behaviors. [Tr. 845]. Plaintiff's mood is "depress[ed] always down; don't care." [Tr. 845].

---

[4] The rating scale utilized in the questionnaire provides five categories: "no problem," "a slight problem," "an obvious problem," "a serious problem," and "a very serious problem." [Tr. 844-47; 1028-31].

Dr. Degen and LCSW Cartagena-Chase's February 15, 2013 assessment of plaintiff's activities of daily living, social interactions and task performance was unchanged from their August opinion [Tr. 1028-31]. Their presentation of plaintiff's psychiatric history was also unchanged. Tr. 1028]. Although she was fully oriented, they opined that she has poor memory, poor attention and poor concentration-"easily distracted" and "fair" judgment. [Tr. 1028-29] Plaintiff reported "many OCD behaviors (counting, checking, arranging), "often paranoid" and visual hallucinations. [Tr. 1029]. Plaintiff's mood is "often depressed, anxious or irritable." [Tr. 1029]

Dr. Degen, a specialist in the field of psychiatry, has treated Ms. Richardson since 2012, and LCSW Cartagena-Chase has provided group and individual therapy since March 2009. [Tr. 271, 691-95]. Mental Health treatment records at Sound Community Services date back to February 2009. This regular contact allowed for the development of a close treatment relationship which is reflected in the contemporaneous treatment notes in the administrative record. Yet, in spite of the consistency and longevity of treatment from plaintiff's treating sources, the ALJ assigned little weight to their opinions.

With respect to these opinions, the ALJ found, in part:

The undersigned has considered the mental health assessments completed by clinician Cartagena and cosigned by Dr. Degen, and assigns them limited weight

14

(Exhibit 12F and 17F). While the statements constitute
opinion evidence from a treating source and could be
given controlling weight, they are not supported by
medically acceptable clinical techniques and are
inconsistent with other substantial evidence in the
case record (Exhibit 10F, 16F, 18F, 22F). See 20
C.F.R. §416.92(c)(2); and Social Security Ruling 96-
2p. Importantly, the opinions are not supported by
clinical signs and findings, but appear to have been
based solely on the claimant's subjective complaints.
The assessments do not account for the claimant's
overall improvement in her mental health with GAF
scores consistently at 54, nor do the opinions reflect
the claimant's significant social stressors, including
DCF involvement with her children, relationship
issues, financial issues, relationship issues and the
claimant's sadness over missing one of her children
(Exhibits 8F, 16F and 18F/25, 30, 35, 50, 55). The
claimant was noted to have ongoing mental health
problems; however, treatment notes document not more
than moderate limitations with no reported
hallucinations, at times (Exhibit 8F, 16F, 18F, 22F).
Moreover, there is evidence of compliance issues and
the claimant was counseled on taking her medications
properly (Exhibit 8F, 16F, 18F and 22F). For these
reasons, the opinions are given limited weight.

[Tr. 28].

First, the ALJ fails to give "good reasons" for assigning

"little weight" to Dr. Degen's opinions because the GAF scores

indicate moderate symptoms and fail to account for "significant

social stressors." [Tr. 28]. The record shows plaintiff's GAF

scores ranged from 36 to 56.[5] Tr. 28; see Tr. 526-30, 531-36,

_____

[5] "GAF rates overall psychological functioning on a scale of 0–
100 that takes into account psychological, social, and
occupational functioning." Zabala v. Astrue, 595 F.3d 402, 405–
06, n. 1 (2d Cir. 2010). "A GAF in the range of 41 to 50
indicates '[s]erious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) OR any serious
impairment in social, occupational, or school functioning (e.g.,

537-40 (GAF 36 2/11/11, 2/22/11, 3/15/11); Tr. 1199-1201 (GAF 45 12/10/13); Tr. 1132-37, 1138-43, 1144-49, 1150-55, 1156-61, 1040-47 (GAF 50 2/6/13, 4/10/13, 5/17/13, 6/14/13, 7/12/13, 10/4/13); Tr. 543-48, 549-54, 555-61, 562-73, 574-79, 580-85, 586-91, 592-97, 640-46, 647-53, 709-15, 1170-77, 1178-85 (GAF 51 4/18/11, 4/2/12, 5/16/11, 6/13/11, 7/15/11, 9/16/11, 10/14/11, 11/15/11, 12/13/11 7/10/12, 9/26/12, 6/6/13, 6/14/13, 7/12/13); Tr. 598-603, 604-09, 610-15, 691-95, 696-700, 701-04, 705-08, 915-19, 920-24, 925-29, 1063-67, 1068-72, 1073-77, 1078-82, 1083-87, 1088-92, 1093-97, 1098-1102, 1213-19 (GAF 54 1/26/12, 2/23/12, 3/19/12, 7/24/12, 8/10/12, 8/31/12, 9/4/12, 10/22/12,11/28/12, 1/2/13, 2/27/13, 3/27/13, 5/10/13, 6/28/13, 8/6/13, 8/29/13, 10/18/13, 11/14/13, 1/13/14); Tr. 616-21, 622-26 (GAF 56 4/16/12, 5/18/12). However, GAF scores are just one factor to consider.

---

no friends, unable to keep a job).'" Id. n.2 (quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV"), at 34 (4th ed. rev. 2000)). "A GAF in the range of 51 to 60 indicates '[m]oderate symptoms (*e.g.,* flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.,* few friends, conflicts with peers or co-workers).'" Id. n.3 (quoting DSM-IV, at 34). "A GAF in the range of 61 to 70 indicates '[s]ome mild symptoms (*e.g.,* depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (*e.g.,* occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.'" Id. n.1 (quoting DSM-IV at 34)).

Although the ALJ was permitted to consider whether Dr. Degen and LCSW Cartagena-Chase had assessed limitations that were inconsistent with the GAF score, the ALJ was not permitted to discount their opinions solely on the basis of that alleged inconsistency. See Hall v. Colvin, 18 F. Supp. 3d 144, 153 (D.R.I. 2014) ("[t]he ALJ's reliance on GAF scores to discredit or find credible certain medical evidence was error"); Price v. Colvin, No. 13-1055-SAC, 2014 WL 1246762, *7 (D. Kan. Mar. 26, 2014) ("[b]ecause a GAF score may not relate to a claimant's ability to work, the score, standing alone, without further explanation, does not establish whether or not plaintiff's impairment severely interferes with an ability to perform basic work activities") (internal citation omitted); Carton v. Colvin, No. 3:13-CV-379 (CSH), 2014 WL 108597, at *15 (D. Conn. Jan. 9, 2014) (finding that "the ALJ erred in relying on the GAF score as indicative of the severity of the plaintiff's mental impairment" and "[t]he ALJ must consider the entire record before reaching her conclusion."); Restuccia v. Colvin, No. 13 Civ. 3294 (RMB), 2014 WL 4739318, at *8-9 (S.D.N.Y. Sept. 22, 2014) (ALJ improperly "concluded that [the treating psychiatrist's] opinion was inconsistent with the psychiatrist's own assessment of the claimant's GAF score showing only mild limitations[;] ... [t]he ALJ did not have a sufficient basis for not according controlling weight to [the psychiatrist's]

opinion"); <u>Daniel v. Astrue</u>, No. 10-CV5397 (NGG), 2012 WL 3537019, at *10 (E.D.N.Y. Aug. 14, 2012) (ALJ failed to provide good reasons for giving no weight to treating source opinions; "[the doctor's] GAF score ..., while relevant, does not contradict his ultimate finding that [plaintiff] was disabled and unable to work because a GAF score does not have a direct correlation to the severity requirements in the [SSA's] disorder listings") (internal quotations marks and citation omitted). Rather, the ALJ was required to evaluate Dr. Degen and LCSW Cartagena-Chase's opinions in light of the factors identified above and in the context of the record as a whole. <u>See</u> <u>Walterich v. Astrue</u>, 578 F. Supp. 2d 482, 515 (W.D.N.Y. 2008) (ALJ improperly discounted treating physician opinion because the limitations assessed were inconsistent with the rated GAF score); <u>see</u>; 20 C.F.R. §416.926a (e)(4)(i) (providing that the ALJ is not permitted to "rely on any test score alone. No single piece of information taken in isolation can establish whether [a claimant is disabled]").

The Court also finds that the ALJ failed to give "good reasons" for assessing "little weight" to the opinions of Dr. Degen and LCSW Cartagena-Chase's on the basis that there "was evidence of medication compliance issues." [Tr. 28]. Similarly, plaintiff argues that the ALJ erred in concluding that throughout her treatment history, "claimant has been fully

18

oriented and free of thought disorder when she is compliant with treatment recommendations." [Tr. 27]. Although, the ALJ found instances in the treatment records addressing medication compliance, the compliance at issue was plaintiff taking too much Klonopin to address her anxiety. See Tr. 694 (counseled on taking extra Klonopin); Tr. 704 (noting Anxiolytic abuse); Tr. 1044 (same); Tr. 1153 (same); Tr. 1216 (objecting to Klonopin taper). The longitudinal treatment record shows that complaints of hallucinations were present with medication compliance, and it is not clear from the ALJ's ruling, or the treatment records, that Klonopin addresses thought disorders or hallucinations.[6] [Tr. 27-8; see Tr. 598-603 (1/26/12: oriented x3, alert, normal speech, goal oriented thoughts, denies hallucinations, denies HI/SI, compliant on medication, denies side effects); Tr. 604-09+-*+9 (2/23/12 (same)); Tr. 792-96 (3/16/12 (same)); Tr. 610-15(3/19/12 (same)); Tr. 802-06 (4/2/12 (same)); Tr. 616-21 (4/16/12 (same)); Tr. 622-26 (5/18/12 (same)); Tr. 691-95 (7/24/12 (same)); Tr. 696-700 (8/10/12 (same, reporting visual hallucinations); Tr. 701-04 (8/31/12 (same, denying hallucinations)); Tr. 705-08 (9/4/12 (same, reporting seeing

---

[6] Klonopin, or Clonazepam, "is used to prevent and control seizures.... It is also used to treat panic attacks. Clonazepam works by calming your brain and nerves." https://www.webmd.com/drugs/2/drug-920-6006/klonopin-oral/clonazepam-oral/details (last checked 3/22/18).

"not harmful" ghosts, medication change requested)); Tr. 915-19
(10/22/12 (same, reporting auditory hallucinations)); Tr. 920-24
(11/28/12 (same, reporting auditory hallucinations)); Tr. 925-29
(1/2/13 (same, denies hallucinations)); Tr. 994-99 (1/2/13
(same); Tr. 1132-37 (2/6/13 (same)); Tr. 1063-67 (2/27/13
(same)); Tr. 1068-72 (3/27/13 (same)); Tr. 1073-77 (5/10/13
(same)); Tr. 1078-82 (6/28/13 (same)); Tr. 1083-87 (8/6/13
(same, reporting auditory hallucinations); Tr. 1088-92 (8/29/13
(same, reporting auditory and visual hallucinations)); Tr. 1093-
97 (10/18/13 (same, reporting auditory hallucinations)); Tr.
1098-1102 (11/14/13 (same, reporting auditory hallucinations,
arrested for shoplifting)); Tr. 1138-43 (4/10/13 (same, denies
hallucinations)); Tr. 1144-49 (5/17/13 (same)); Tr. 1150-55
(6/14/13 (same)); Tr. 1156-61 (11/28/12 (same, reporting visual
hallucinations)); Tr. 1199-1200 (12/10/13 same, denied
hallucinations, Emergency Psychiatric Evaluation-transported to
Emergency Department by police after alleged threat "to hurt her
ex-boyfriend and...hire someone to do so." Noting pending
larceny charge for stealing underwear); Tr. 1193-1209 (12/10/13
Emergency Department Records stating plaintiff complained of
chest pain and "anxiety H/T," deemed safe for discharge); Tr.
1213-19 (1/13/14 (oriented x3, alert, normal speech, goal
oriented thoughts, denies hallucinations, denies HI/SI,
compliant on medication, denies side effects, irritable,

anxious)). Indeed, it is disingenuous to conclude that "[t]reatment notes from 2014 reflect no hallucinations" when there is only one treatment record for 2014. On January 13, 2014, Dr. Goyal noted that plaintiff complained of extreme anxiety and not sleeping, "feeling irritable, sarcastic, belligerent, argumentative, and entitled" in response to Klonopin taper. [Tr. 1213-19].

Dr. Degen and LCSW Cartagena-Chase, and other mental health providers at Sound Community Services, consistently noted plaintiff was anxious, paranoid, persecutory, experienced auditory and visual hallucinations, and depression. [Tr. 517 (anxious, visual and auditory hallucinations, paranoid, persecutory); Tr. 523, 527 (irritable, anxious, depressed, paranoid); Tr. 601 (increased depression, affect flat); Tr. 628, 641, 648 (noting "acute stress disorders with sedative, hypnotic or Anxiolytic Abuse. Verbalizes a marked increase in symptoms of anxiety (e.g., irritability, sleep problems, poor concentration, gross motor agitation"); Tr. 629, 642; 649 ("[a]ssist the client in listing current stressors that are attributed to the co-occuring disorders (e.g. social isolation due to fears of reliving the traumatic event, financial problems due to impairment in occupational functioning, legal problems due to acquiring medications by fraudulent means" "severe and persistent mental illness," anxiety, "[p]anic attacks as

evidenced by discrete, brief periods of intense fear and discomfort[,]"); Tr. 691-94 (restricted affect, abnormal appearance, anxious, difficulty sleeping; Tr. 697 (irritable, anxious, depressed, paranoid, visual hallucinations); Tr. 702, 792 (anxious, depressed, paranoid); Tr. 706, 708 (abnormal appearance, restricted affect, irritable, anxious, depressed, visual hallucinations, unstable mood); Tr. 944 ("reports a lot of anxiety and panic attacks"); Tr. 798, 801 (depressed, "noted anhedonia, isolate/withdraw at times"); Tr. 820-21 (auditory hallucinations, paranoid, "reports racing thoughts, poor sleep, increased paranoia, lack of energy, depressed and anxious"); Tr. 916 (anxious, depressed, auditory hallucinations, paranoid); Tr. 921 (irritable, anxious, depressed, auditory hallucinations, paranoid); Tr. 926 (anxious, depressed, paranoid); Tr. 938 (abnormal speech, anxious, depressed, auditory hallucinations, paranoid); Tr. 944 ("reports a lot of anxiety and panic attacks"); Tr. 984-85, 987 (restricted affect, anxious, "worsening anxiety," reported hospital visit for a panic attack); Tr. 990, 992 (restricted affect, anxious, depressed, "unstable mood"); Tr. 997 ("unstable mood"); Tr. 1040-41, 1044 (abnormal appearance, lethargic, flat affect, circumstantial thoughts, "hx psychosis nos, mood do nos, sed abuse"); Tr. 1132-33, 1135 (abnormal appearance, restricted affect, anxious, depressed, tearful, unstable mood); Tr. 1064, 1066 (anxious,

depressed, paranoid, "very upset today"); Tr. 1069 (anxious,
depressed, paranoid); Tr. 1074 (anxious, paranoid); Tr. 1079,
1081 (anxious, depressed, paranoid, "very upset"); Tr. 1084,
1086 (anxious, irritable, depressed, auditory hallucinations,
paranoid, OCD behaviors, "spending a lot of time just in bed,
reporting feeling depressed, reports having no energy to deal
with these things"); Tr. 1089, 1091 (anxious, auditory and
visual hallucinations, paranoid, "mood a little irritable"); Tr.
1094 (anxious, depressed, irritable, auditory hallucinations,
paranoid); Tr. 1099, 1101 (anxious, depressed, auditory
hallucinations, paranoid, "a lot of anxiety," arrested for
shoplifting to afford food); Tr. 1112  (abnormal speech,
anxious, depressed, irritable, auditory hallucinations,
paranoid); Tr. 1115 ("reports a lot of anxiety and panic
attacks"); Tr. 1139, 1141 (restricted affect, anxious,
depressed, irritable, "unstable mood"); Tr. 1145 (anxious); Tr.
1151, 1153 (restricted affect, irritable, "unstable mood"); Tr.
1157, 1159 (restricted affect, irritable, circumstantial
thoughts, visual hallucinations, paranoid, "voice poorly
modulated," "unstable mood"); Tr. 1172-73 ("[ve]rbalized a
marked increase in symptoms of anxiety (e.g., irritability,
sleep problems, poor concentration, gross motor agitation),
severe and persistent mental illness", "anxiety, panic attacks
as evidenced by discrete, brief periods of intense fear and

discomfort", "mania/hypomania, expansive, variable moods that lead to impatience, irritability, anger or assaultiveness when thwarted or confronted"); Tr. 1188-89 ("severe and persistent mental illness, anxiety, obsessive thoughts and/or compulsive behaviors in an attempt to decrease a sense of fear", "depression-diminished interest in or pleasure derived from previously enjoyable activities"); Tr. 1214, 1216 (anxious, irritable, "[p]resents as feeling irritable, sarcastic, belligerent, argumentative and entitled.")].

On February 19, 2014, LCSW Cartagena-Chase completed a mental impairment questionnaire, noting "M.D. not available for signature." [Tr. 1225]. Ms. Cartagena-Chase described plaintiff's prognosis as "a chronic, serious condition ... her symptoms have increased. The meds help some, but outside stressors have also increased. I expect her inability to work full time to continue." [Tr. 1220]. Symptoms identified included anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with weight change, decreased energy, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, psychomotor agitation, apprehensive expectation, paranoid thinking or inappropriate suspiciousness, recurrent obsessions or compulsions which are a source of marked distress, emotional withdrawal or isolation, hallucinations or delusions,

motor tension, memory impairment-short, intermediate or long term, sleep disturbance, and recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week. [Tr. 1221]. In assessing plaintiff's mental abilities and aptitudes needed to do unskilled work, LCSW Cartagena-Chase opined that plaintiff was "seriously limited, but not precluded" from carrying out very short and simple instructions, working in coordination with or proximity to others without being unduly distracted, making simple work-related decisions; and "unable to meet competitive standards" such as: remember work-like procedures, maintain attention for two hour segment, maintain regular attendance and be punctual within customary, usually strict tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in a routine work setting, and deal with normal work stress. [Tr. 1222]. In a hand written note, the therapist explained that plaintiff's "last formal job was in 2007" and that "severe anxiety, paranoia and depression symptoms get in the way." Id. In assessing plaintiff's ability/aptitude to do semiskilled and skilled work,

the therapist opined that plaintiff was "unable to meet competitive standards" in understanding and remembering detailed instructions, carrying out detailed instructions, setting realistic goals or making plans independently of others, and dealing with stress of semiskilled and skilled work. [Tr. 1223]. In a hand written explanation of the basis for this assessment, the therapist noted "client report (we did this questionnaire together), and therapist observation over time." Id. Finally, the therapist assessed plaintiff's mental abilities and aptitude to do particular types of jobs, opining that plaintiff was "limited but satisfactory" in interacting appropriately with the general public, maintaining socially appropriate behavior; "limited" to "seriously limited but not precluded" using public transportation and "unable to meet competitive standards" involving travel in unfamiliar places. Id. In a handwritten explanation, the therapist stated "same difficulty with symptoms especially anxiety." Id. In assessing functional limitations, Ms. Cartagena-Chase assessed "marked" difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence or pace. [Tr. 1224]. "[A]s reported by client," the therapist noted "four or more" episodes of decompensation within a 12 month period, each of at least two weeks duration. Id. The therapist added in a handwritten note, "when Dr. changed meds earlier in Feb[ruary] she went to

hospital with panic attacks."[7] <u>Id.</u> Also, Ms. Cartagena-Chase indicated that plaintiff had "[a]n anxiety related disorder and frequent, serious inability to function independently outside the area of one's home"; expected absences of more than four days per month, and her condition is expected to last at least twelve months. [Tr. 1224-25]. As set forth above, this opinion was not co-signed by plaintiff's treating physician, "M.D. not available for signature." [Tr. 1225]. Ms. Cartagena-Chase's opinion is consistent with her contemporaneous treatment records and the records of Dr. Degen and other mental health providers at Sound Community Services.

Further, in assigning "little weight" to Dr. Degen and LCSW Cartagena-Chase's opinions, the ALJ also found that "the opinions do not reflect the claimant's significant social stressors, including DCF involvement with her children, relationship issues, financial issues, ... and the claimant's sadness over missing one of her children. (Exhibit 8F, 16F and 18F/25, 30, 35, 50, 55)." [Tr. 28; <u>see also</u> Tr. 25, 26, 27 (referring to "significant social stressors" in his ruling]. While the Mental Health Questionnaire does not solicit a response for "social stressors," Dr. Degen, LCSW Cartagena-Chase

---

[7] Plaintiff was seen at William Backus Hospital on February 9, 2014, complaining of chest pain, fluttering heart and anxiety. [Tr. 1209-10].

and other providers at Sound Community Services made multiple references throughout the treatment records to plaintiff's struggles with basic needs (including food and housing), difficulty with child-rearing responsibilities, financial and legal challenges and "acute stress disorder." See e.g. Tr. 518, 523 (noting DCF involvement, paranoid about DCF); Tr. 699 (noting plaintiff was cut-off from state benefits); Tr. 628, 641, 648 (noting "acute stress disorders"); Tr. 629, 642, 649 (assist client with current stressors); Tr. 821 (noting plaintiff was worried about money, moving, applying for benefits); Tr. 923 (discussed benefits and housing issues); Tr. 1066 (noting plaintiff is "terrified" of her daughter's father who is petitioning for child support and visitation); Tr. 1076, 1086 (noting plaintiff is behind in the rent, "paying some but never all"); Tr. 1091 (noting little money for food and struggling to keep up with bills); Tr. 1096 ("stressed by basic needs issues; never has enough money for food for the month, and is always behind on bills."); Tr. 1101 (noting that plaintiff was arrested for shoplifting, reporting that plaintiff returned things for store credit to then buy food, often not eating.)].

"An ALJ must specifically inquire into and analyze a claimant's ability to manage stress." Bryant v. Berryhill, No. 17-CV-6060-FPG, 2017 WL 6523294, at *3 (W.D.N.Y. Dec. 21, 2017) (citing Haymond v. Colvin, No. 1:11-CV-0631 MAT, 2014 WL

2048172, at *9 (W.D.N.Y. May 19, 2014)); <u>Hidalgo v. Colvin</u>, No.
12CV9009-LTS-SN, 2014 WL 2884018, at *16 (S.D.N.Y. June 25,
2014) ("The Regulations articulate that claims concerning mental
disorders require a robust examination that is sensitive to the
dynamism of mental illnesses and the coping mechanisms that
claimants develop to manage them ....") (citing 20 C.F.R. Pt.
404, Subpt P, App. 1 §12.00(E)); <u>see</u> 20 C.F.R. Pt. 404, Subpt P,
App. 1 §12.00(E) ("Particular problems are often involved in
evaluating mental impairments in individuals who have ...
prolonged outpatient care with supportive therapy and
medication. For instance, if you have chronic organic,
psychotic, and affective disorders, you may commonly have your
life structured in such a way as to minimize your stress and
reduce your symptoms and signs. In such a case, you may be much
more impaired for work than your symptoms and signs would
indicate.").

. Here, the ALJ fails to evaluate how plaintiff with her
psychiatric impairments responds to stress and how stress
affects her ability to work.

> Because stress is 'highly individualized,' mentally
> impaired individuals 'may have difficulty meeting the
> requirements of even so-called 'low-stress' jobs,' and
> the Commissioner must therefore make specific findings
> about the nature of a claimant's stress, the
> circumstances that trigger it, and how those factors
> affect [her] ability to work." <u>Stadler v. Barnhart</u>,
> 464 F. Supp. 2d 183, 188-89 (W.D.N.Y. 2006) (citing
> S.S.R. 85-15, 1985 WL 56857 (S.S.A. Jan 1, 1985) and

> Welch v. Chater, 923 F. Supp. 17, 21 (W.D.N.Y. 1996)
> ("Although a particular job may appear to involve
> little stress, it may, in fact, be stressful and
> beyond the capabilities of an individual with
> particular mental impairments.")). An ALJ must
> specifically inquire into and analyze a claimant's
> ability to manage stress. See Haymond v. Colvin, No.
> 1:11-CV-0631 MAT, 2014 WL 2048172, at *9 (W.D.N.Y. May
> 19, 2014).

Bryant, 2017 WL 6523294, at *3.

> Social Security Ruling 85-15 directs the Commissioner
> to consider that "determining whether these
> individuals will be able to adapt to the demands or
> 'stress' of the workplace is often extremely
> difficult." The Ruling explains that this difficulty
> arises because individuals with mental illnesses
> "adopt a highly restricted and/or inflexible lifestyle
> within which they appear to function well." SSR 85-15.
> The Rulings point out that, when claimants are in
> structured settings, they are able to function
> adequately "by lowering psychological pressures, by
> medication, and by support from services."

Hidalgo, 2014 WL 2884018, at *17.

Given the evidence described above and the considerations articulated in SSR 85-15, the Court finds that remand is required because the ALJ did not address or consider Ms. Richardson's ability to handle stress.

The ALJ's failure to articulate "good reasons" for discounting Dr. Degen and LCSW Cartagena-Chase's opinions constituted legal error, and remand is appropriate for the ALJ to determine the weight, if any, to accord these opinions based upon the relevant factors and the record as a whole. Although the ALJ may conclude that Dr. Degen and LCSW Cartagena-Chase's

opinions are still entitled to "little weight," he must nonetheless provide good reasons supported by substantial evidence for his determination. Because re-evaluation of the weight to be assigned to Dr. Degen and LCSW Cartagena-Chase's opinions could affect the ALJ's RFC assessment and the rest of the sequential evaluation process, the Court does not reach plaintiff's other arguments. Norman v. Astrue, 912 F. Supp. 2d 33, 86 (S.D.N.Y. 2012) ("[b]ecause I find legal error requiring remand, I do not reach the issue of whether the ALJ's decision was supported by substantial evidence.").

As noted earlier, the Court's role in reviewing a disability determination is not to make its own assessment of the plaintiff's capabilities; it is to review the ALJ's decision for any reversible error.

## VI.  CONCLUSION

For the reasons stated, plaintiff's Motion to Reverse and/or Remand Decision of Commissioner of Social Security Administration **[Doc. #18]** is **GRANTED** in part and **DENIED** in part. This case is remanded for further proceedings consistent with this opinion. Defendant's Motion for an Order Affirming the Decision of the Commissioner **[Doc. #20]** is **DENIED**.

In light of the Court's findings above, it need not reach the merits of plaintiff's remaining arguments. Therefore, this matter is remanded to the Commissioner for further

31

administrative proceedings consistent with this opinion. On remand, the Commissioner shall address the other claims of error not discussed herein.

The Clerk's Office is instructed that, if any party appeals to this court the decision made after this remand, any subsequent social security appeal is to be assigned to the Judge who issued the ruling that remanded the case.

This is not a Recommended Ruling. The parties consented to proceed before a United States Magistrate Judge [doc. #31] on December 21, 2017, with appeal to the Court of Appeals. Fed. R. Civ. P. 73(b)-(c).

SO ORDERED at Bridgeport this 26th day of March 2018.

_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE